**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CHRISTOPHER O. WALLACE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 12 C 222** |
| ) | |
| **MICHAEL J. ASTRUE,**[1] ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher O. Wallace brings this action under 42 U.S.C. § 405(g), seeking to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff subsequently filed a motion seeking reversal of the Administrative Law Judge's decision, and the Commissioner filed a brief opposing the motion. After careful review of the parties' briefs and the record, the Court now grants Plaintiff's motion and remands the matter for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on April 9, 2009, alleging that he became disabled beginning on April 4, 2006 due to arthritis, asthma, tendonitis, hypertension, and depression. (R. 19, 101, 108). The Social Security Administration denied the

---

[1]     On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security, and is automatically substituted as Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

applications initially on October 5, 2009, and again on reconsideration on April 22, 2010. (R. 19). Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Jose Anglada held a hearing on April 11, 2011, where he heard testimony from Plaintiff, represented by counsel, and a vocational expert. (R. 9, 56-92). On April 28, 2011, the ALJ found that Plaintiff, then 50 years old, is not disabled because he is capable of performing jobs that exist in significant numbers in the Chicago Metropolitan Area economy. (R. 30-31). The Appeals Council denied Plaintiff's request for review on November 25, 2011. (R. 1-3).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. In his motion, Plaintiff advances two main grounds for reversal. First, he argues that the ALJ failed to identify his arthritis as a severe impairment at Step 2 or assess whether his arthritis meets or equals a listing at Step 3 of the analysis. Next, he contends that the ALJ erred in determining his Residual Functional Capacity by not explaining the weight he gave to the opinions of various state agency physicians as it pertains to his limitations arising from his arthritis and asthma.

## FACTUAL BACKGROUND

Plaintiff was born on March 2, 1961, and was 45 years old on the alleged disability onset date of April 4, 2006. (R. 19, 30). He is able to communicate in English. (R. 30). He dropped out of high school in the 11th grade and has not completed a GED. (R. 61). His past relevant work experience is factory work. From March 1999 to April 2006, he worked in the automotive industry doing shipping, receiving, and loading and unloading of trucks. (R. 29, 62, 360, 362). Prior to that, from May 1990 to February

1998, he worked in the chemical industry lifting heavy bags of chemicals and pouring them into mixing bowls and barrels.  (R. 360-361).

## A.    Plaintiff's Medical History

The record in this matter shows a history of complaints of asthma, arthritis and tendonitis beginning in 2004 and continuing into early 2011.

### 1.    2004

The earliest documentation shows that Plaintiff presented to the Covenant Healthcare emergency room in Saginaw, Michigan twice in May 2004 complaining of shortness of breath on the first occasion and right shoulder pain on the second occasion. (R. 335, 336).  He was given nebulizer treatment for the asthma and five-day prescriptions of Solu-Medrol and Prednisone.  (R. 335).  The doctor noted that Plaintiff "smokes half pack a day" and that the shortness of breath "started two days ago in a smoky room." (*Id.*).  For the shoulder pain, he was prescribed Vicodin, Motrin, and exercises.  (R. 336).  The doctor's notes indicate that Plaintiff has a history of asthma and tendonitis of the right shoulder, for which he has been taking Vicodin.  (*Id.*).

### 2.    2005

On two occasions in March 2005, Plaintiff presented at the Saint Mary's Hospital ER in Saginaw complaining of difficulty breathing.  (R. 286, 333-34).  On March 21, a chest x-ray was taken, which was normal.  (R. 286).  When he returned to the ER on March 28, he received intravenous Solu-Medrol and two Albuterol nebulizer treatments and was prescribed Albuterol inhaler refills and five days of steroids.  (R. 334).  Plaintiff "improved dramatically" in the ER and was discharged.  (*Id.*).

On September 1, 2005, Plaintiff tested positive for cocaine and opiates. (R. 269). Dr. Enam Hanna of Janes Street Academic Community Health Center addressed the cocaine abuse with him on September 12, 2005, when Plaintiff presented complaining of left ankle edema, which Dr. Hanna believed was a possible sprain, and shoulder pain for which it was noted he sees a Dr. Chamberlin. (R. 245). Plaintiff saw Dr. Hanna again on September 22, 2005, complaining of left ankle pain and bilateral shoulder pain, greater on the left. (R. 296). X-rays showed "some very minimal degenerative changes particularly in the anterior ossify as well as some syndesmotic old calcification in the distal fibular shaft." (*Id.*). Dr. Hanna diagnosed rotator cuff tendonitis and bursitis, for which he recommended strengthening and range of motion exercises; left ankle arthritis with acute exacerbation, for which he recommended an ankle brace and physical therapy; and hallux valgus (bunions) for which he recommended wider shoes. (*Id.*). In a U.S. Department of Labor Certification of Health Care Provider form dated November 7, 2005, Dr. Hanna noted that Plaintiff "may work intermittently" but "will need to be off for Dr. visits, specialist appointments, [and] physical therapy." (R. 293). Dr. Hanna also noted that Plaintiff was referred to, but did not see, a physical therapist and rheumatologist. (*Id.*).

**3.    2006**

In January 2006, Plaintiff complained of difficulty breathing, but had a negative chest x-ray. (R. 268). In February 2006, a doctor from Janes Street Health Center found his breathing to be "fairly well controlled" but noted that he needs Singulair and is "still smoking," although down to half a pack per day. (R. 236). For his asthma, the doctor recommended continuing Albuterol and Singular, and low doses of Florent and

Atrovent, as well as tobacco cessation, and advised Vicodin for his osteoarthritis and shoulder bursitis. (*Id.*). Also in February 2006, MRIs of both shoulders showed no rotator cuff tear, but indicated extensive peri-tendinosis in the right shoulder and severe peri-tendinosis in the left shoulder, as well as rotator cuff impingement due to arthritis in both shoulders. (R. 282-83). Plaintiff requested monthly medication refills from Dr. Hanna from February through May 2006, and on June 2, 2006 he had a follow-up visit during which he complained of asthma and shoulder pain. (R. 228, 229-34).

In August 2006, bilateral hip x-rays showed some "early degenerative changes in both hips, with fairly well maintained joint spaces bilaterally;" "some areas of sclerosis and lucency in both femoral heads, suggesting avascular necrosis," and "a couple calcifications adjacent to the femoral neck on the left." (R. 281). In October 2006, Plaintiff complained to Dr. Hanna of acute lower back pain. (R. 215-16).

**4.    2007**

Plaintiff continued to complain of pain in his shoulders and hips during visits to Dr. Hanna in January and June 2007. (R. 205, 211). In June 2007, Dr. Carter administered corticosteroid injections to both shoulders for his chronic tendonitis. (R. 203). Plaintiff received Vicodin refills from Dr. Hanna for more than two years, through the end of 2008 when Plaintiff moved out of state. (R. 205-16). Plaintiff also complained of respiratory difficulties during office visits in September ("tight chested at night" despite wearing a mask for his roofing job) and November 2007 ("wheezing" nightly), for which Dr. Hanna continued to prescribe Albuterol and Advair. (R. 198, 201). Dr. Hanna counseled Plaintiff on smoking cessation in April and September 2007, and noted in November 2007 that he smokes half a pack per day. (R. 198, 201, 208).

### 5. 2008

In 2008, Plaintiff again saw Dr. Hanna for shoulder pain in February and for shoulder and hip pain and asthma in September and October. (R. 177, 180, 191). Plaintiff's prescriptions were refilled for Vicodin, Singulair, and Albuterol; QVAR was added to treat his asthma, and he was again counseled on smoking cessation. (R. 177, 180). He returned to Dr. Hanna in late November 2008 for exacerbation of his asthma and for left side pain after a bicycle fall. (R. 174). At that time, Plaintiff was treating his asthma with Albuterol and Prednisone and was not taking QVAR; Dr. Hanna advised continued used of Albuterol and Prednisone, provided samples of QVAR, and reiterated the need to stop smoking. (*Id.*). He advised Ibuprofen for the pain from the fall. (*Id.*).

Plaintiff also presented to the Covenant ER on three occasions in late 2008. On October 28 and November 13, he went to the ER complaining of shortness of breath. (R. 314, 318). He received IV Solu-Medrol on both occasions. (R. 314, 318). On the October visit, he was admitted overnight; on the November visit he had a negative chest x-ray, "markedly improved" after a coughing spell, and was discharged the same day. (R. 314, 318). On December 26, he complained of acute asthma and chest pain. (R. 309). Dr. Hanna referred him for an exercise stress test, which showed a normal baseline EKG and "[a]dequate exercise capacity and effort" and no cardiac symptoms. (R. 279). A chest x-ray showed "no evidence of focal consolidation, edema, pneumothorax, or pleural effusion," but lateral oblique views showed "an unusual configuration of the cardiac silhouette" which is "most probably artifactual" but should be followed up by repeat chest x-ray or CAT scan. (R. 309-10). Plaintiff was discharged

as stable with prescriptions for Albuterol and Advair, and Dr. Hanna "strongly counseled" him to quit smoking, which he agreed to do. (*Id.*).

### 6. 2009

In early 2009, Plaintiff relocated from Michigan to the Chicago area. (R. 63-64). Plaintiff presented to Provident Hospital twice on March 13, 2009 complaining of asthma exacerbation, for which he was admitted for two days, continued on his medication regimen and counseled to avoid the tobacco and illicit substances that trigger his asthma. (R. 506-10). Plaintiff missed his April 14, 2009 appointment at Provident, but presented to the ER at Roseland Community Hospital on April 6, 16, and 21, complaining of asthma exacerbation, for which he was given various combinations of Xopenex, Solu-Medrol, and Prednisone, and counseled to stop smoking. (R. 451-474, 494, 515). He was also seen for his asthma at Provident Hospital on April 17, where he was given nebulizer treatment and discharged in stable condition the following morning. (R. 494-503). At that time, Plaintiff indicated he was smoking 2-3 cigarettes per day. (R. 494).

Plaintiff was seen for a follow-up visit at Provident on May 1, 2009, where it was noted that his asthma was "improving" and he was referred to pulmonology. (R. 513-14). He presented at the Provident Hospital ER on May 11, 2009 complaining primarily of asthma, but also of pain in his fingers radiating up to his shoulder and neck. (R. 482). He was discharged and instructed to continue his medication regimen and to "stop smoking." (R. 485). At a follow-up visit on June 12, 2009, he was given a Z-pack for acute bronchitis and put on Atrovent and Combivent for his asthma. (R. 512). For his

shoulder pain, he was scheduled for a corticosteroid injection and was switched from Albuprofen to Naproxen and given Tylenol #3.  (*Id.*).

On July 30, 2009, Dr. Myrtle Mason completed a Psychiatric Evaluation for the Illinois Bureau of Disability Determination Services ("DDS") upon referral for depression. (R. 520-524).  Dr. Mason met with Plaintiff for 30 minutes and diagnosed him with depressive disorder due to his asthma and arthritis, and substance use disorder based on alcohol dependence and a history of cocaine and marijuana abuse.  (R. 524).

Also on July 30, 2009, Dr. Sujatha Neerukonda completed an Internal Medicine Consultative Examination for the DDC.  (R. 528-531).  Dr. Neerukonda reviewed Plaintiff's records and conducted a 30-minute examination.  (R. 528).  Her notes identify Plaintiff's complaints as asthma (for the previous 18 years), COPD[2] (2 years), hypertension (4 years), bilateral shoulder pain worse on the right (2 years), ankle pain and swelling (1 year), low back pain (2 years), and depression (7 months).  (R. 529). She identified Plaintiff's various asthma and pain medications (Tylenol #3, Combivent, Singulair, Serevent, QVAR, Amitriptyline, Amlodipine, Naprosyn, Prednisone, Albuterol, Ibuprofen, and Proventil), his occasional alcohol use, denial of drug use, and smoking habit of 2-3 cigarettes per day.  (*Id.*).  She conducted a physical examination, observing that "[b]reath sounds are harsh and distant bilaterally" and "[n]o rhonchi or wheezes." (R. 530).  She also observed as follows:

> MUSCULOSKELETAL: Examination reveals no limitation of movement in cervical spine.  Right shoulder flexion is limited to 0 to 120 degrees, extension limited to 0 to 20 degrees, abduction limited 0 to 130 degrees

---

[2]         COPD, or chronic obstructive pulmonary disease, "is a progressive disease that makes it hard to breathe."  Among other symptoms, COPD can cause coughing, wheezing, shortness of breath, and chest tightness.  "Cigarette smoking is the leading cause of COPD." U.S. Department of Health & Human Services, National Heart, Lung, and Blood Institute, http://www.nhlbi.nih.gov/health/health-topics/topics/copd/ (last viewed June 11, 2013).

and rotation within normal limits.  Left shoulder flexion is limited to 0 to 130 degrees, abduction limited to 0 to 140 degrees, extension limited to 0 to 30 degrees and internal and external rotation no limitation.  No limitation in the elbows and wrists.  Lumbar flexion is limited 0 to 60 degrees, extension limited 0 to 20 degrees and right and left lateral bending limited 0 to 20 degrees.  Tenderness at L3 and L4.  Right hip flexion limited 0 to 80 degrees, extension limited 0 to 20 degrees, abduction limited 0 to 20 degrees, adduction no limitation, internal rotation limited 0 to 20 degrees and external rotation limited 0 to 20 degrees.  Left hip flexion is 0 to 90 degrees, and everything [else] is no limitation.  No limitation in the knees and right ankle.  Left ankle is swollen and tender both malleolus.  Dorsiflexion limited 0 to 10 degrees and plantar flexion limited 0 to 15 degrees.  Gait, limp on the left foot for 50 feet an assistive device.  The claimant was unable to do toe walk.  Heel walk was severely limited.  Tandem gait was mildly limited.  Squat and getting on and off the examination table no limitation.  Straight leg raise is negative.  The claimant is right hand dominant.  Bilateral fist is 100% and grip is 5/5.

(R. 530).  Her clinical impression identified the following conditions: uncontrolled hypertension, bronchial asthma, COPD, bilateral shoulder arthralgia, right hip degenerative joint disease, left ankle arthralgia, depression, and lumbar arthralgia.  (R. 531).  X-rays were taken that same day of Plaintiff's right hip, lumbar spine, and left ankle.  The hip radiology report found "mild degenerative narrowing" of the right hip joint and "possible osteonecrosis" of the right femoral head  (R. 525).  The lumbar radiology report found "[a]dvanced degenerative disc changes" at L4-L5, mild to moderate degenerative disc changes at L3-L4, and moderately advanced degenerative joint changes at L4-L5 and L5-S1.  (R. 526).  The left ankle x-ray revealed "probably mild narrowing of the anterior tibiotalar joint."  (R. 527).

On July 30, 2009, the same day he was examined by Dr. Neerukonda, Plaintiff was also examined by Dr. Robert Noven.  (R. 532).  In an Addendum to the Internal Medicine Consultative Examination, Dr. Noven explained that he was asked to examine Plaintiff when he "had an exacerbation of symptoms and developed acute shortness of

breath" after completing his examination with Dr. Neerukonda.  (*Id.*).  Dr. Noven stated that Plaintiff's examination "revealed diffuse wheezing and diminished breath sounds" and "heart sounds were regular and rapid."  (*Id.*).  Dr. Noven advised him not to proceed with his pulmonary function test due to the exacerbation of symptoms and to consult his primary care doctor.  (*Id.*).  Within the next several days, Plaintiff went to three different ERs on four separate occasions for asthma symptoms, where he was given Albuterol and Prednisone and was discharged.  (R. 533-72).  A chest x-ray on August 1, 2009 revealed a normal-sized heart, clear lungs, no excess fluid, and no active cardiopulmonary pathology.  (R. 573-74).  Another chest x-ray on August 22, 2009 also showed an "[e]ssentially normal chest" with normal heart size and tissues, clear lungs, and no infiltrates.  (R. 623-24).

On August 20, 2009, Dr. Francis Vincent completed an initial Request for Medical Advice for the DDS.  (R. 575-577).  Based on Plaintiff's allegations of asthma, Dr. Vincent advised a review for asthma equal to Listing 3.03B with an onset date of April 30, 2009.  (R. 575).  On September 3, 2009, consulting pulmonologist Dr. James McKenna prepared a Case Analysis.  (R. 625).  Based on his review of the file, Dr. McKenna concluded that plaintiff "has known asthma" and has been treated with medication, but "has not had regular follow-up visits and was not taking asthma 'controllers'" prior to seeking care on March 16, 2009.  Dr. McKenna further noted that when he was admitted for asthma from March 13-15, 2009, Plaintiff tested positive for cocaine, "a potent bronchioconstrictor which commonly exacerbates asthma" and which "is contrary to any know asthma management plan."  (*Id.*).  Thus, while a "hospital admission for an asthma exacerbation ordinarily would count for two 'severe attacks,'"

Dr. McKenna questioned whether this admission qualifies given the cocaine use. (*Id.*). Dr. McKenna found that even if Plaintiff's April 16, 2009 ER visit and April 17-20, 2009 hospital stay are construed as 3 severe attacks, this still falls short of the 6 severe attacks in a 12-month period required to satisfy Listing 3.03B. (*Id.*). Accordingly, Dr. McKenna concluded that "the DDS' assessment of an impairment of Listing 3.03B severity is not supported by the medical evidence in file," however Plaintiff "should avoid even moderate exposure to extreme cold or to respiratory irritants" given his persistent asthma. (*Id.*).

On September 15, 2009, internist Dr. Joseph Franger prepared a Case Analysis assessing Plaintiff's joint pain. (R. 626). He concluded that the medical records support a "severe" impairment "involving multiple joints," and that Plaintiff's statements concerning his joint pain are credible and supported by the records. (*Id.*). In particular, he noted that Plaintiff's hip necrosis "is at further risk because of corticosteroid use for his asthma" and that the "natural history of this condition is one of progression." (*Id.*). He found that the records support the RFC of May 20, 2008, but with further limitations. (*Id.*). Specifically, he concluded that Plaintiff can stand/walk a maximum of 2 hours per day, must never climb ladders or scaffolding, and must avoid even moderate exposure to extreme cold due to asthma. (R. 627-28).

On September 23, 2009, Dr. J.V. Rizzo prepared a Case Analysis concerning Plaintiff's allegation of depression. (R. 629). Dr. Rizzo concluded that Plaintiff's statements regarding his depression "are consistent with evidence in file and credible," and that his mental impairments are not severe. (*Id.*). On October 2, 2009, Dr. Kirk Boyenga prepared a Psychiatric Review Technique that found Plaintiff "partially

credible" and concluded that Plaintiff's mental impairments are not severe. (R. 630-643).

On October 2, 2009, Dr. Richard Bilinsky completed a Physical Residual Functional Capacity Assessment for the DDS, which included a review of Dr. Neerukonda's assessment. (R. 644-51). Dr. Bilinsky stated a primary diagnosis of COPD, a secondary diagnosis of hypertension, and other alleged impairments of asthma and arthritis. (R. 644). He concluded that Plaintiff can occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk at least 2 hours in an 8-hour work day, sit about 6 hours in an 8-hour work day, and has no limitations on his ability to push or pull. (R. 645). He found that Plaintiff is occasionally limited in stooping, crouching, and climbing ladders, ropes and scaffolds due to ankle, back, and shoulder pain. (R. 646). Finally, he found that Plaintiff is limited in his ability to reach in all directions, and should avoid concentrated exposure to extreme cold and fumes, odors, dusts, gases, and poor ventilation due to COPD. (R. 647-48). Dr. Bilinsky found Plaintiff's statements concerning his COPD "partially credible in light of the overall evidence," but concluded that "the extent of the limitations described by [Plaintiff] in terms of his breathing problems, exceeds that supported by the objective medical evidence," namely Dr. Neerukonda's physical examination. (R. 651).

Three days later, on October 5, 2009, Plaintiff presented at MetroSouth Medical Center for chest pain, where he was found to be "[c]linically drunk" but "stable from a cardiology standpoint and was counseled on smoking cessation. (R. 721). Shortly thereafter, on November 2, 2009, he had a follow-up visit where he sought help for alcoholism. (R. 885-87). The doctor's notes indicate that he had begun a detox

program, but it was "not going well" so he "checked [him]self out," and his drinking is "out of control." (R. 887).

Upon complaining of chest pain and asthma exacerbation on December 21, 2009, a chest x-ray showed normal heart size and vascularity and clear lungs, and a chest CT angiography showed some evidence of pneumonia. (R. 821, 843, 845). Plaintiff received nebulizer treatment and IV Solu-Medrol. (R. 853).

### 7.    2010

Plaintiff continued to experience similar symptoms and present to the ER throughout 2010. On January 15 and 30, 2010, he presented to the MetroSouth ER with chest pain for which he received Albuterol and Prednisone. (R. 1015-16, 1040-46). He had follow-up visits on January 20 and March 16, 2010, where he sought refills of his asthma medications and complained of shoulder and hip pain (R. 880-83), and on June 18 and August 20, 2010, where his condition was mostly unchanged. (R. 909-12). But on October 22, 2010 he complained that his arthritis pain had worsened and he needed more inhaler puffs than he did previously. (R. 907). He went to the MetroSouth ER with asthma symptoms on November 24, 2010, where he was given Albuterol and Prednisone (R. 985-86), and on December 28, 2010, where he was not administered any medications (R. 971-77).

### 8.    2011

Plaintiff's symptoms continued in early 2011. A chest x-ray on January 7, 2011 was stable and unchanged from a prior x-ray taken on January 15, 2010. (R. 964). On January 16 and 21, 2011, Plaintiff presented to the MetroSouth ER with asthma exacerbation, where he received Albuterol nebulizer treatment and Solu-Medrol and

13

was discharged.  (R. 917-18, 933-34).  It was noted that he uses alcohol daily and is currently a smoker.  (R. 917, 933).  On January 21, the same day he was at the ER, he also had a follow-up visit at the Near South Health Clinic, where his asthma was reported as "stable" and his "breathing good," and he was prescribed a cane and advised to lose weight to manage his chronic arthritis pain.  (R. 906, 1049).

## B.    Plaintiff's Testimony

At the hearing before the ALJ on April 11, 2011, Plaintiff testified that he suffers from asthma, arthritis, and tendonitis.  (R. 62, 66).  He was hospitalized due to asthma about three times in 2010 after experiencing tightness in his chest.  (R. 66, 67).  He has a breathing machine that he uses at home when he feels an asthma attack coming on, but it does not always work.  (R. 66-67).  His asthma medication also does not always work, so he goes to the hospital for "a stronger dose."  (R. 67).  His attacks typically last 30 minutes and the medication and breathing treatment leaves him "shaky" and "jittery" for about two hours afterwards.  (R. 84).  He has treated his arthritis with heating pads at home and cortisone shots from his doctor.  (R. 71).  He takes Vicodin and Ibuprofen daily for pain, which helps "[o]ff and on" but makes him "groggy."  (*Id.*).  He uses a cane that his doctor prescribed to him for his hip problems.  (R. 73).  His doctor has not recommended hip replacement surgery, but advises continued treatment with heat and pain medication.  (R. 82, 85).  Plaintiff also dealt with alcohol abuse from 2007 to 2010 and was in an alcohol rehabilitation program in August 2010.  (R. 64-65).

In terms of his recent work history, Plaintiff testified that he dropped out of high school in the 11th grade and does not have a GED.  (R. 60-61).  At the time of the hearing, he was not working and his sole income was public assistance.  (R. 61).  He

previously did factory work for seven years.  (R. 62).  For the last three of those years, he had arthritis and tendonitis, and sought lighter duty work, but "nobody would hire [him]" due to his arthritis and asthma, including his sensitivity to chemicals.  (R. 62, 69). He stopped working entirely in April 2006 because he "couldn't do the lifting" or the pushing and pulling, and "was missing days at work being in the hospital back and forth [and] in the ER" due to arthritis, tendonitis, and asthma.  (R. 62, 68).

In terms of his functional capacity, Plaintiff testified that he has difficulty standing and sitting for long periods of time due to arthritis in his hips and lower back.  (R. 70). He can walk about a block with or without his cane, but it causes hip pain.  (R. 77).  He can stand for about 10 to 15 minutes and can sit for about 20 minutes before his hips and lower back hurt.  (*Id.*).  During a typical workday, he would need to alternate sitting and standing about 10 times, but could only stand for about 30 to 45 minutes total in an 8-hour workday.  (R. 83, 84).

Plaintiff lives with his fiancée, who cooks breakfast for him and helps him bathe and dress.  (R. 64, 75, 78).  He prepares his own lunch in the microwave, but otherwise cannot stand long enough to cook for himself.  (R. 76).  He sometimes has trouble lifting a gallon of milk and rarely performs any household chores, other than occasionally washing a few dishes or mopping the floor if he's having a good day.  (R. 78-79).  He watches TV and movies at home and sometimes reads the newspaper, but does not go to the movie theatre because the seats are uncomfortable.  (R. 80-81).  He has difficulty sleeping due to pain.  (R. 81-82).  Plaintiff testified that he has not had a driver's license since it was suspended 22 years previously.  (R. 60).

**C.     Letter from Plaintiff's Girlfriend**

The ALJ noted in his decision that he also took into consideration a letter from Plaintiff's girlfriend, Sharon Robinson. (R. 25, citing R. 443). In the letter, Ms. Robinson stated that she has lived with Plaintiff for three years, that he "complains of pain all the time," and that they go to the hospital often because he has shortness of breath and his breathing machine doesn't work. (R. 443). She also stated that she helps him dress most days due to the pain in his shoulders, and that he cannot stand for long periods of time due to shortness of breath. (*Id.*).

**D.     Vocational Expert's Testimony**

Leann Kerr testified at the hearing as a vocational expert ("VE"). (R. 85). The VE identified Plaintiff's past relevant work as a loader/packer, which was unskilled light work but performed by Plaintiff at the heavy level, and as a shipping/receiving clerk, which was medium work performed by Plaintiff at the heavy level. (R. 64-65).

The ALJ then described a hypothetical individual of Plaintiff's age, education, and work experience who is able to lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and/or walk about four hours and sit about six hours during an eight-hour workday with normal rest periods; cannot work at heights, climb ladders, or frequently negotiate stairs; can only occasionally stoop or crouch; should avoid concentrated exposure to extreme temperatures, fumes, odors, gases, or poorly ventilated areas; should avoid working or moving dangerous machinery; and needs a cane to walk more than one block. (R. 87). The VE testified that such an individual would be precluded from performing all of Plaintiff's past work, but could perform the "full range of sedentary [work] but not quite the full range of light [work] due to the

amount of time on feet." (R. 87-88). The VE further testified that light, unskilled jobs that would allow for intermittent standing and sitting, with no more than four hours on the feet, include office helper (2,100 positions), information clerk (2,300), and cashier (2,500). (R. 88-89). However, the VE testified that the individual would be unable to perform any of these jobs if he was limited to sedentary work. (R. 89).

The ALJ then revised the hypothetical to assume the same factors and limitations reflected in the initial hypothetical, but adding the limitation that the individual was off task five percent of the time during an 8-hour workday. (R. 89). The VE testified that this "would be allowable," but that the individual would be terminated if he was off task more than 15 percent of the workday or absent more than one day per month. (*Id.*).

Plaintiff's attorney then revised the hypothetical to assume the same factors and limitations reflected in the initial hypothetical, but adding the limitation that the individual required a sit/stand option 10 times per day lasting for 10 minutes each, equating to "about 100 minutes off task." (R. 90). The VE responded that it would preclude work if it took the individual off task, but would allow for work if the individual "could remain on task and functioning even through they're changing positions." (*Id.*). Finally, the VE testified that all competitive employment would be eliminated if the individual could only stand/walk for two hours per day and sit for two hours per day, constituting less than an 8-hour workday in total. (R. 90-91).

## E.    ALJ's Decision

In his written decision, the ALJ found Plaintiff not disabled under the relevant provisions of the Social Security Act. (R. 31). In applying the five-step sequential analysis required by 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff has

not engaged in substantial gainful activity since the alleged onset date of April 4, 2006. (R. 21). At Step 2, he then determined that Plaintiff has the severe impairments of asthma, hypertension, and polysubstance and alcohol abuse. (*Id.*). However, at Step 3, the ALJ determined that none of these impairments met or medically equaled any of the listed impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 22-23). Specifically, as to Plaintiff's asthma under Listing 3.03, the ALJ found that Plaintiff's asthma attacks "do[] not satisfy the listing requirement of prolonged symptomatic episodes lasting one or more days and requiring intensive treatment," and further noted that "it is questionable as to whether [Plaintiff] was compliant with prescribed treatment and whether [he] was forthright with his treating physicians as to the status of his cigarette smoking and using, something [he] admitted exacerbated his symptoms." (R. 22). As to Plaintiff's hypertension under Listing 4.00(H), he found "little or no evidence regarding effects of hypertension" on Plaintiff, and cited evidence showing that Plaintiff's hypertension "has been noted to be benign and well controlled with medication." (*Id.*). As to his depression under Listing 12.04, the ALJ found under the Paragraph B criteria that Plaintiff has only moderate restriction of daily living activities, mild difficulties in social functioning, and no difficulties in maintaining concentration, persistence, or pace, and that he has experienced no episodes of decompensation of extended duration, nor has he satisfied the Paragraph C criteria showing a chronic affective disorder of two years or more. (R. 22-23). As to his alcohol and substance use under Listing 12.09, the ALJ found that the record shows that Plaintiff's history of substance abuse did not elevate his impairments to the level of severity required by the listing for the reasons explained in his decision. (R. 23).

Proceeding to Step 4, the ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform light work except that he "can lift 20 pounds occasionally and 10 pounds frequently; can be on his feet standing/walking about 4 hours and sit about 6 hours in an 8 hour workday, with normal rest periods[;]…is unable to work at heights, climb ladders, or frequently negotiate stairs[;]…may only occasionally stoop or crouch[;]…should avoid concentrated exposure to extremes of temperatures, fumes, odors, dusts, gases, or poorly ventilated areas[;]…should avoid working around moving or dangerous machinery; and…needs a cane to ambulate more than one block." (R. 24). Upon considering the evidence, the ALJ concluded that Plaintiff can perform a variety of activities of daily living. (R. 24-25). The ALJ noted that Plaintiff alleged an asthma onset date of April 4, 2006, but the medical records show he was not treated with asthma medications until 2009, and many chest x-rays were "largely normal." (R. 25). The ALJ found it significant that Plaintiff was often non-compliant with treatment – missing appointments, failing to follow through with asthma education and pulmonary testing referrals, not taking medications as directed, continuing to smoke despite repeated instructions to stop (and knowing that it aggravated his asthma), taking cocaine on at least one occasion, and continuing to drink alcohol heavily. (R. 25-26). The ALJ noted that none of Plaintiff's treating or examining physicians have "endorsed" his allegations of disability, emphasizing that his primary care doctor found his asthma to be "stable" and his "breathing good" in January 2011. (R. 27, 28). The ALJ also discussed the various state agency consulting physician opinions, assigning great weight to certain portions of their opinions and

moderate, limited, or no weight to other portions in light of the totality of the evidence. (R. 28-29).

In his credibility finding, the ALJ found that "the information provided by [Plaintiff] may not be entirely reliable" given inconsistencies between his statements and the record evidence. (R. 28). Among other inconsistencies, the ALJ found it significant that Plaintiff has a history of alcohol abuse and tobacco use which he misrepresented to medical providers, as well as instances where Plaintiff made opposite representations about his condition to his treating physicians compared to ER staff. (R. 27). For example, the ALJ referenced an instance where Plaintiff told MetroSouth staff that he was "currently" smoking, but told Near South clinic staff (three months prior) that "he was quitting or had quit smoking." (R. 27, citing. R. 907, 917). The ALJ also noted that Plaintiff gave conflicting information about his education. (R. 28).

The ALJ then found that Plaintiff is unable to perform his past relevant work, but relying on the VE, concluded that there are other jobs that exist in sufficient numbers in the Chicago Metropolitan Area that Plaintiff can perform, given his age, education, work experience, and RFC. (R. 29-31). Accordingly, the ALJ found that Plaintiff was not disabled since his alleged disability onset date. (R. 31).

## DISCUSSION

### A.    Disability Standard

A claimant who can establish he is "disabled" as defined by the Social Security Act, and was insured for benefits when his disability arose, is entitled to Disability Insurance Benefits. 42 U.S.C. §§ 423(a)(1)(A), (E); *see also Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). In order to qualify for Supplemental Security Income,

a claimant must establish that he is "disabled" and eligible for SSI benefits as defined by the Social Security Act. 42 U.S.C. §§ 416(i)(1), 1382(a)(1). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any gainful employment that exists in the national economy. *Id.* at § 423(d)(2)(A).

In order to determine whether a claimant is disabled, the ALJ conducts a standard five-step inquiry, set forth in 20 C.F.R. § 404.1520(a)(4), which requires the ALJ to consider in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals one of a list of specific impairments enumerated in the regulations; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is able to perform other work in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)); *see also* 20 C.F.R. § 404.1520(a)(4).

**B.     Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. 42 U.S.C. § 405(g). A "court will reverse an ALJ's

denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "'build an accurate and logical bridge from the evidence to the conclusion.'" *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons).

**C.      Analysis**

The Court now addresses Plaintiff's two arguments challenging the ALJ's decision.

**1.      ALJ's Failure to Consider Arthritis at Steps 2 and 3**

Plaintiff challenges the ALJ's failure to find at Step 2 of the sequential analysis that he is severely impaired by arthritis in his spine and hips and at Step 3 that his arthritis meets or medically equals a listed impairment identified in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). As discussed below, the ALJ's failure to do so requires the matter to be remanded.

The ALJ's first error was his failure to mention, let alone discuss, Plaintiff's arthritis at Step 2. An ALJ "is required to determine at step two of the sequential analysis whether the claimant in fact has an impairment or combination of impairments that is 'severe.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (citing 20 C.F.R. § 404.1520(a)(4)(ii)). "A severe impairment is an impairment or combination of impairments that 'significantly limits [one's] physical or mental ability to do basic work activities.'" *Castile*, 617 F.3d at 926 (citing 20 C.F.R. § 404.1520(c)). If an ALJ finds an impairment to be severe at Step 2, the ALJ must then consider at Step 3 whether the impairment meets or equals a listed impairment. The severity finding at Step 2 is merely a threshold finding, and thus if an ALJ finds that one or more impairments are severe, the ALJ must then at Step 3 "consider the aggregate effect of this entire constellation of ailments – including those impairments that in isolation are not severe." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (citing 20 C.F.R. § 404.1523); *see also Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). The burden is on the claimant at Step 2 to show severity. *Castile*, 617 F.3d at 926-27.

Here, the ALJ failed to even mention arthritis at Step 2, despite ample objective and subjective evidence of this impairment. The ALJ's Step 2 analysis consists in its entirety of the following:

> 3. The claimant has the following severe impairments: asthma; hypertension; and polysubstance and alcohol abuse (20 CFR 404.1520(c) and 416.920(c)).

> These impairments impose more than minimal restrictions on the claimant's ability to perform basic work activities. Accordingly, I find that these impairments are severe.

(R. 21). It is puzzling that the ALJ omitted any mention of Plaintiff's arthritis, even if to

explain why it is non-severe, given the extensive record evidence of Plaintiff's joint problems and their effect on him. The record is replete with Plaintiff's complaints of arthritis pain and his use of Vicodin over at least three years to treat it. (R. 177, 180, 191, 203-16, 236, 512). Plaintiff also testified at the hearing that he takes Vicodin and Ibuprofen daily for the pain, uses heating pads at home, has received cortisone shots from his doctor, and walks with a cane prescribed by his doctor. (R. 71, 73, 1049). The medical records from examining and consulting physicians are also ample. For example, MRIs of both shoulders in February 2006 showed extensive peri-tendinosis in the right shoulder and severe peri-tendinosis in the left shoulder, as well as rotator cuff impingement due to arthritis in both shoulders. (R. 282-83). X-rays taken on July 30, 2009 found "mild degenerative narrowing" of the right hip joint and "possible osteonecrosis" of the right femoral head; "[a]dvanced degenerative disc changes" at L4-L5, mild to moderate degenerative disc changes at L3-L4, and moderately advanced degenerative joint changes at L4-L5 and L5-S1, and "mild narrowing of the anterior tibiotalar joint" of the left ankle. (R. 525-27). That same day, Dr. Neerukonda completed a consultative examination for the DDC, including a musculoskeletal examination that revealed various limitations in flexion, abduction, extension, and rotation of both shoulders, the lumbar spine, the right hip, and the left ankle, as well as inability to do toe walk, severe limitations in heel walk, and mild limitations in tandem gait. (R. 530). Dr. Neerukonda's clinical impression included bilateral shoulder arthralgia (joint pain), right hip degenerative joint disease, left ankle arthralgia, and lumbar arthralgia. (R. 531). A case analysis review by Dr. Joseph Franger on September 15, 2009 concluded that the medical records support a "severe" impairment

"involving multiple joints," and that Plaintiff's statements about his pain are credible and supported by the records. (R. 626).

Given that Step 2 is simply a threshold finding, and the ALJ here progressed to Step 3 based on other severe impairments he identified, his failure to mention arthritis at Step 2 would have been remedied had he discussed Plaintiff's arthritis at Step 3. But he failed to do so, never evaluating whether it meets or equals a listing on its own or in combination with his other severe impairments. The Listings identify and describe impairments that are considered severe enough *per se* to prevent an individual from performing significant gainful activity, regardless of age, education, and work experience. 20 C.F.R. § 404.1525(a). Thus, if a claimant satisfies the requirements of a listed impairment, he is presumptively considered disabled and the inquiry ends. *Id.* at § 404.1520(d); *see Lavarier v. Astrue*, No. 09 CV 7881, 2011 WL 2116412, *15 (N.D. Ill. May 27, 2011); *Stramaglio v. Astrue*, No. 09 C 50040, 2011 WL 1118725, *7 (N.D. Ill. Mar. 28, 2011). Accordingly, if Plaintiff's arthritis satisfies a listing, he is deemed disabled.

Here, Plaintiff argues that the ALJ failed to evaluate whether his arthritis of the hip and spine satisfies Listing 1.02 (major dysfunction of a joint) and/or Listing 1.04 (disorders of the spine).[3] The Commissioner responds that "[a]s a preliminary matter, it

---

[3]    Major dysfunction of a joint under Listing 1.02 is "[c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" together with: (A) "Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;" or (B) "Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. Disorders of the spine under Listing 1.04 include, among other conditions, osteoarthritis

is significant that no medical source opined that Plaintiff's impairments met or equaled the criteria of Listing 1.02." (Doc. 25 at 4). However, opinions concerning whether a claimant is disabled are not medical opinions, but rather are opinions reserved for the Commissioner. 20 C.F.R. § 404.1527(e). Thus, it is not dispositive that no medical source expressly opined on whether Plaintiff's condition satisfied a specific listing. Moreover, the Commissioner is misplaced in relying on the ALJ's own statement that "none of the claimant's treating or examining physicians have endorsed the claimant's allegations of disability…" (Doc. 25 at 4, citing R. 28), particularly given that the ALJ omitted any mention of state agency reviewing physician Dr. Franger, who opined that the medical records support a "severe" disability "involving multiple joints." (R. 626). The ALJ's statement and the Commissioner's argument also fail to take into account the medical evidence of arthritis identified above, including clinical tests and examinations. This factual scenario is distinguishable from the sole case cited by the Commissioner, in which two state agency physicians expressly found that the claimant's impairments did not satisfy a listing and there was no contrary medical opinion. (Doc. 25 at 6, citing *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009)).

The Commissioner next argues that, in any event, the evidence does not support a finding that Plaintiff meets or equals Listing 1.02 or 1.04. But it is not the role of this Court to weigh the evidence and make a determination as to whether a listing is satisfied. *See Robinson v. Astrue*, 667 F.Supp.2d 834, 843 (N.D. Ill. 2009) ("As the Seventh Circuit has explained, 'regardless whether there is enough evidence in the

---

and degenerative disc disease "resulting in compromise of a nerve root…or the spinal cord" together with evidence of nerve root compression characterized by pain, limitation of motion, motor loss accompanied by sensory or reflex loss and, if the lower back is involved, positive straight-leg raising test. *Id.* at § 1.04.

record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.'") (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)). Rather, it is the role of this Court to assess whether the ALJ performed the required analysis. *See Robinson*, 667 F.Supp.2d at 843 ("The question here is whether the ALJ engaged in the required analysis, not whether, if the ALJ had engaged in the required analysis and had found against [Plaintiff], that conclusion would have been supported by substantial evidence.") (citing *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000)).

Here, the ALJ performed no analysis whatsoever of Plaintiff's arthritis at Steps 2 or 3 by failing to mention the condition entirely, let alone articulate a rationale for his determination that Plaintiff's arthritis is not severe and does not meet or equal a listing. He did this despite a record containing x-rays, tests, and other medical evidence of Plaintiff's arthritis. This is analogous to *Robinson*, where the court remanded because the ALJ "fails to discuss or even acknowledge" whether the plaintiff satisfied a listing for a condition where the record contained "significant evidence" that the plaintiff was diagnosed with and suffered from the condition. *Robinson*, 667 F.Supp.2d at 841-43; *see also McKinney v. Astrue*, No. 10 C 2134, 2011 WL 3704259, *10 (N.D. Ill. Aug. 22, 2011) (same). In fact, by arguing that the ALJ was not required to discuss the listings due to the insufficiency of the evidence, "the Commissioner puts the cart before the horse" as "[i]t is only after reviewing the evidence that the ALJ could have made an informed determination as to whether the Listing[s] requirements had been met." *Robinson*, 667 F.Supp.2d at 843. "Indeed, by speculating what the ALJ could have concluded based on the evidence, the Commissioner 'violated the *Chenery* doctrine

(*see SEC v. Chenery Corp.*, 318 U.S. 80, 87-88, 63 S.Ct. 454, 87 L.Ed. 626 (1943)), which forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.'" *Thomas v. Astrue*, No. 09 C 7851, 2011 WL 5052049, *7 (N.D. Ill. Oct. 19, 2011) (quoting *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)).

For these reasons, and without reaching any conclusions as to whether Plaintiff's arthritis may meet or equal a listing, the Court remands this matter for further consideration of Plaintiff's arthritis in the context of Listings 1.02 and 1.04.

## 2. The RFC Determination

Plaintiff also challenges the ALJ's RFC on the ground that the ALJ failed to explain the weight he gave to the opinions of various state agency physicians as they relate to Plaintiff's limitations arising from his arthritis and asthma.

In order to determine at Steps 4 and 5 of the analysis whether the claimant can perform his past relevant work or adjust to other work, the ALJ must first assess the claimant's RFC, which is defined as the most the claimant can do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, *2. This requires an ALJ to consider all functional limitations and restrictions that stem from medically determinable impairments, including those that are not severe. *See* SSR 96–8p, 1996 WL 374184, *5. In doing so, an ALJ is not permitted to "play doctor" or make independent medical conclusions that are unsupported by medical evidence or authority in the record. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Clifford*, 227 F.3d at 870. Nor may an ALJ selectively consider medical reports. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Godbey*, 238 F.3d

at 808.  An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions.  *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Berger*, 516 F.3d at 544.

As discussed below, the RFC is not supported by substantial evidence because the ALJ selectively accepted and rejected portions of opinions from the various state agency physicians without explaining his basis for doing so.  For example, state agency pulmonologist Dr. McKenna determined that Plaintiff should avoid even moderate exposure to extreme cold or respiratory irritants, yet the ALJ found, without providing any explanation, that "the greater weight of the evidence supports only avoiding concentrated exposure to extreme cold and pulmonary irritants."  (R. 28).  The Commissioner argues that the ALJ's discussion of Plaintiff's asthma provides sufficient explanation, citing for example that "the ALJ pointed out that Plaintiff smoked cigarettes and was told to quit smoking by medical staff a countless number of times" as "smoking would presumably be contrary to any know asthma management plan."  (Doc. 25 at 7, citing R. 26).  While the ALJ does indeed reference evidence that smoking exacerbates Plaintiff's asthma, the ALJ does not reference smoking (or any other evidence) in rejecting Dr. McKenna's determination.  And it is not clear on its face why Plaintiff's smoking habit supports the conclusion that he should avoid only "concentrated" rather than "even moderate" exposure to cold and irritants.  The Commissioner also argues generally that elsewhere in his decision the ALJ identified inconsistencies "which suggested that Plaintiff was seeking physician intervention primarily in order to generate evidence for his disability application and appeal…"  (Doc. 25 at 8, citing R. 27-28).  But again, it is not clear how such inconsistencies support the ALJ's decision to replace his

own opinion for Dr. McKenna's. Notably, later in his decision the ALJ specifies that he accepts the less stringent limitation proposed by state agency physician Dr. Bilinsky, whose specialty is unknown, concerning exposure to pulmonary irritants, while rejecting without explanation the more stringent limitation stated by Dr. McKenna, a pulmonologist. This perplexing finding only further confuses any rationale that may underlie the ALJ's determination.

Plaintiff also cites the example of the ALJ's assigning "limited weight" to state agency internist Dr. Franger's RFC assessment finding that Plaintiff could stand or walk a maximum of 2 hours per day. Again, the ALJ provides no explanation whatsoever for his determination that Plaintiff can, in fact, stand or walk for 4 hours per day. Likewise, the ALJ selectively accepts and rejects portions of the RFC assessment by state agency physician Dr. Bilinsky, determining based "on the substantial evidence of record and giving the claimant the benefit of every due consideration" to "assign great weight to Dr. Bilinsky's opinion as to lifting, sitting, stooping, crouching, and avoiding concentrated exposure to pulmonary irritants" while "agree[ing] with his opinion that the claimant could stand and walk *at least* 2 hours in an 8 hour workday, but find[ing] that he could stand/walk for about 4 hours in an 8 hour workday…" (R. 29) (emphasis in original). Nowhere in the decision does the ALJ identify what medical evidence supports his conclusion that Plaintiff can stand and walk for 4 hours in an 8-hour workday. In defending the ALJ's determination concerning Dr. Bilinsky, the Commissioner relies again upon the misguided assumption that no physician "endorsed" Plaintiff's allegations of disability, which as discussed above is not accurate and is, in any event, insufficient evidence to support the ALJ's selective consideration of the medical reports

and his rejection of a medical opinion in favor of his own unsupported conclusions.  *See Clifford*, 227 F.3d at 870-71; *see also Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Godbey*, 238 F.3d at 808.

As noted previously, the ALJ must "build an accurate and logical bridge from the evidence to the conclusion."  *Berger*, 516 F.3d at 544; *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons).  The ALJ failed to give a well-supported justification for selectively accepting and rejecting portions of the medical opinions in crafting the RFC. Nor did he identify other medical source opinions or objective medical evidence in the record that support his contrary RFC determination, particularly as it relates to Plaintiff's ability to tolerate exposure to extreme cold and pulmonary irritants or his ability to stand or walk for 4 hours in an 8-hour workday.  Accordingly, the RFC is not supported by substantial evidence.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 20] is granted.  Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: June 11, 2013

_____
SHEILA FINNEGAN
United States Magistrate Judge